## COMSTOCK *v*. POTTER.

1. CONTRIBUTION—FRAUD—EVIDENCE—BURDEN OF PROOF.

On a bill for contribution from cosureties on promissory notes the proceeds of which were used to promote an automobile concern in which plaintiff and defendants, all mature business men of experience, were stockholders, the defense being that defendants were fraudulently induced to indorse the notes, the burden of proof was upon defendants.[1]

2. SAME—EVIDENCE—SUFFICIENCY.

Evidence *held*, insufficient to make out a case of fraud, and the decree of the court below in favor of plaintiff is affirmed.

[1]See notes in 35 L. R. A. (N. S.) 64; L. R. A. 1915A, 898.

Appeal from Cheboygan; Shepherd, J. Submitted April 12, 1918. (Docket No. 71.) Decided September 27, 1918.

Bill by William A. Comstock against Fred N. Potter and others for contribution as cosureties on certain promissory notes. Defendants filed a cross-bill claiming fraud. From a decree for plaintiff, defendants appeal. Affirmed.

*Henry & Henry* (*V. D. Sprague*, of counsel), for plaintiff.

*I. S. Canfield*, for defendants.

STEERE, J. Plaintiff brought this suit to recover from defendants contribution as cosureties on an indebtedness of $15,000 to the Alpena County Savings Bank paid by him, for which the bank held eight promissory notes for $1,875 each dated July 31, 1914, payable six months after date with 6% interest per annum, each note signed by one of the parties hereto and indorsed by the others. The money represented by these notes was borrowed by the parties to this action in 1912 to meet the necessities of the Alpena Motor Car Company, a corporation in which they were all stockholders, then a going concern, which had become but a regretful memory when plaintiff paid the notes. At the time the loan was originally made, on July 31, 1912, a single note for $15,000, payable six months after date, was given, signed by plaintiff as "trustee under agreement of May 11, 1912," personally indorsed by him and defendants. It was renewed in that form as a single note several times and then split up into these individual notes mutually indorsed, which, not being paid when they fell due, were protested for nonpayment by the bank. On February 26, 1915, the bank wrote the signers and indorsers calling attention

to the fact the notes were not paid when due and had been protested, saying in part:

"We will not expect you to delay arranging for these matters later than noon of March 3, 1915."

On April 16, 1915, the bank sent plaintiff a statement of principal, interest and protest fees due on the notes, amounting to $15,658, saying,

"We have been unable to make collection of these and hereby request that you take same up."

This plaintiff did by then giving to the bank a check for the interest and charges with his personal note for $15,000 secured by certain railroad stock owned by him assigned as collateral. This he paid December 8, 1915.

An order of the trial court overruling defendants' demurrer to plaintiff's bill of complaint in this case was reviewed and sustained in *Comstock* v. *Potter,* 191 Mich. 629. Reference may be made to the report of that case for the substance and theory of plaintiff's bill for contribution; also for a historical outline of events connected with the Alpena Motor Car Company leading up to the litigation between the parties, both it and the kindred case of *Comstock* v. *Corbin,* 191 Mich. 639, may be consulted. In the latter case defendants' demurrer to a bill for exoneration was sustained, it not there appearing plaintiff had yet paid the debt for which he claimed defendants were liable, as had been done in the instant case.

This case having been remanded for further proceedings, defendants filed answer in denial claiming the benefit of a cross-bill, the gist of their defense being that they were induced to enter into the trust agreement of May 11, 1912, and to sign these notes through false and fraudulent representations made by plaintiff and defendant Roberson as to the financial condition of the Motor Car Company and value of an

equity in the so-called "Netherlands property," held as security for the notes, asking as affirmative relief that said agreement and notes be declared void and defendants' liability thereon decreed to be at an end.

Plaintiff answered the cross-bill in denial of the alleged fraud and the case was heard upon pleadings and proofs, consisting of oral testimony in open court and depositions taken by the respective parties. An opinion was thereafter filed by the trial court holding defendants liable for contribution upon the loan of $15,000, according to the notes they signed and plaintiff had paid, dismissing their cross-bill.

At the time this bill was filed by plaintiff, August 14, 1915, the secured note which he had given the bank to take up these notes had not yet been paid by him and it is argued for defendants that the "real situation of the parties and their liability upon their notes was not changed by the trustee putting his own note in their place." There was no question of trusteeship involved in this matter so far as the bank was concerned. The notes were each signed personally by the makers and indorsers. The bank had protested them for nonpayment, demanded payment, and then called upon plaintiff to take them up, which he did with money and secured paper acceptable to the bank. It thereafter had no claim on the notes nor against the makers or indorsers for the debt they represented. As between it as payee and them, and between plaintiff and defendants, he had paid the notes held by the bank against all of them as makers and indorsers.

It is further contended as a proposition of law that plaintiff's claim for contribution is premature even if he did pay the notes, and cannot be entertained by the court until he has disposed of the Netherlands property and wound up his trusteeship under the trust agreement of May 11, 1912, described in 191 Mich. 629. If defendants' contention is tenable it would seem to

follow that defendants' demurrer was then wrong-
fully overruled, for the situation is unchanged in that
particular and it was there noted that plaintiff claimed,
as is shown here, that he "had held and managed the
'Netherlands property' without compensation, apply-
ing the income to payment of interest, charges, taxes,
and expenses, but had been unable to sell the property,
and so he had not paid any part of the indebtedness
scheduled in said last named agreement," which in-
cluded the original $15,000 note. Though not espe-
cially discussed in that decision, this question, dis-
tinctly a matter of demurrer, was then as squarely in
the case and before the court as now, and presumably
disposed of in the order overruling the demurrer. But
if not, we find nothing in any of their agreements
making liability on the $15,000 note of July 31, 1912,
running for only six months, contingent upon de-
ficiency in the proceeds from a sale of the trust prop-
erty, which defendants allege in their answer "was of
no value above the incumbrance thereon that could be
realized by a sale of the same, all of which was well
known by plaintiff." The $15,000 loan was apparently
not in contemplation when the agreement of May 11,
1912, was entered into, for it was not made nor men-
tioned until July 31, 1912, when it was orally agreed
upon, as plaintiff testified, to meet the then pressing
necessities of the Motor Car Company, although pos-
sibly contemplated in the provision of the trust agree-
ment for application of balance, if any, of the proceeds
in case of sale under written consent of all parties
after paying all expenses and incumbrances thereon.
But by it some $23,000 of other notes previously given
would take priority, and it was then recognized the
residue might not be adequate for as to them it was
"agreed that if said property does not bring a suf-
ficient sum of money to pay all of said notes in full

each of the parties of the second part shall bear equally his portion of the unpaid amounts due on said notes."

It is claimed by plaintiff, though disputed by defendants, that the parties agreed this $15,000 borrowed by them for the Motor Car Company was a stock subscription, and it appears so credited on the books of the company. Weight is given to this claim by their subsequently splitting up the amount into individual notes mutually indorsed for acceptance by the bank. From the fall of 1911 unsuccessful efforts were made to dispose of the Netherlands property which plaintiff had been caring for in the meantime, without compensation. The change to separate notes was admittedly agreed to and made on his suggestion because, as he claimed, his liabilities in this and other business matters were pressing him. Collins, who was at one time president of the Motor Car Company, testified:

"The $15,000 note was divided up into $1,875 notes, of which I signed one, because Mr. Comstock said they were holding this note against his line of credit at the bank and that if we would sign these notes separately that would help his credit there at the bank and I was willing to do that. And did do so."

Comstock testified that he requested this—

"because these men who were on these notes know as well as I do that the bank had been hammering for payment of these notes for nearly two years; and when we got them split up it was with the idea that the next time those notes became due they were to have,—if not a substantial payment, to be paid entirely; but each one was going to assume his share. That was the understanding. * * *

"Q. The bank's understanding?

"A. That is the understanding with these men. They were told that."

This is controverted by defendants who claim plaintiff assured them they would thus secure an ex-

tension of credit and eventually the debt would be cared for by proceeds from sale of the Netherlands property. If so, it is difficult to discover how his credit would be helped or the situation relieved in any way as to him by the change. Defendants were business men of mature years, presumably with knowledge of the significance of commercial paper of this kind when given by them. After signing them they did not pay or care for them when they became due and were protested by the payee. When payment was demanded of plaintiff as an indorser he paid them to protect his credit. His right to contribution under the facts in this case was not contingent upon or deferred to the sale of the Netherlands property.

The defense of fraudulent inducement, to which the testimony in this ample record is largely devoted, is essentially an issue of fact with the burden of proof on defendants. The Alpena Motor Car Company was organized in 1910 for the manufacture of automobiles in the city of Alpena and ended in hopeless bankruptcy, in 1913. It was locally promoted with an appeal to local loyalty, and is described as a "Chamber of Commerce proposition." One of the projects for raising capital for it was a donation by the city and county of a piece of land to the Chamber of Commerce which platted the same and sold lots to citizens at $200 each, giving each purchaser of a lot a bonus of $50 par value of preferred stock and $50 par value of common stock of the company. Plaintiff at that time became a stockholder to the extent of 15 shares of common and 15 shares of preferred stock through becoming one of the subscribers to the original sale of lots. He was absent from Alpena much of the time during 1910 and 1911 and took no part or interest in the affairs of the company prior to the spring of 1912 except with others to indorse for it two $8,500 notes in the fall of 1911. He testified that he first indorsed paper for the com-

pany because they said, "If you will indorse this paper, why, the bank will take it," and his interest in the affairs of the company started when he commenced to get home to Alpena more than usual in the spring of 1912, but he did not contemplate becoming interested or active in its management until he became a director in May, 1912, and was forced into it.

Defendant Roberson, with whom it is charged plaintiff conspired to defraud the other defendants, was active from the beginning in the promotion and efforts to finance the Motor Car Company which was launched in a promising period of over-optimism as to that industry, when promotion of automobile manufacturing companies throughout the country was in flower. He had then recently organized the Alpena News Publishing Company, in association with the owners of a paper called the Argus, by purchasing the Alpena Evening News and other papers which they consolidated, had previously been engaged in the advertising and publishing business in Detroit, and testified that he first became interested in the auto factory project through advocating in his paper the contribution of a bonus to help it as a local industry to manufacture an automobile which certain Alpena men had designed. He, however, became one of the directors when the company was organized and was selected as its secretary, treasurer and general manager.

These defendants were all business men of Alpena, of mature years and experience in the business world; most if not all of them were from the beginning connected with this enterprise and more familiar with its promotion than plaintiff. Collins, a contractor and builder, was a director, its president and later its general manager. Corbin and Hill were in the cedar and lumber business together for many years; Corbin was a director; Fred N. Potter, who was also a director, and when these notes were given its secretary, had

been in the insurance business and at that time was postmaster of Alpena; J. J. Potter and J. D. Potter were old hardware merchants.

By the efforts of Roberson and those associated with him in the enterprise the company was sufficiently financed locally to acquire and equip a factory and entered upon the manufacture and sale of the designed automobile. Plaintiff is not shown to have had anything to do with his selection as manager, and, as Corbin admitted, had no active connection with the management of the auto company until Roberson went away; but the fact is stressed by defendants that he was a former acquaintance of plaintiff and for several years in his employ. Roberson testified that he went to Alpena in 1906 and entered plaintiff's employ at a salary of $125 a month and, of his duties, that he had charge of plaintiff's real estate, looked after the bookkeeping in his office and did such other work as he was instructed or authorized to do. Plaintiff testified that the only transactions of importance Roberson had charge of for him were building up the "Temple Theatre" and running a creamery business they had started for the purpose of developing the wild lands around Alpena then going to waste, which was an expensive failure and admitted that as it turned out Roberson did not prove to be a successful business man for him. There is little in the record beyond defendants' surmise from the bare facts that Roberson was in plaintiff's employ and they were friendly, to support the charge of their co-operation to defraud defendants by false representations.

Early in 1911, when the need of additional working capital became pressing, Roberson made various efforts to dispose of more treasury stock with indifferent success, but while in Washington on that mission he made a deal through some brokers for the equities

in an apartment building called the Netherlands, which was incumbered by two mortgages, the first being for $85,000 and the second for $40,000. For this he agreed to give $50,000 treasury stock of the Motor Car Co. and a third mortgage of $25,000, making the total incumbrance on the property $150,000. From an examination of the property, inquiries as to values and appraisals shown him, he became satisfied, as he testified and told officers and directors of the company, that in his opinion the property was worth about $200,000 and proposed that the company take over the deal. This was accepted by the directors and the equity in the property was assigned to the auto company on issuance of the $50,000 treasury stock to the vendor. Not long thereafter an agreement was entered into by which the title to this property was conveyed to him in trust to secure the indorsers of the two $8,500 notes of September 26, 1911, which plaintiff was induced to indorse, and two notes of $3,000 each indorsed by defendants Potter, making $23,000 thus raised to carry on the business of the company. In January, 1912, Roberson resigned his connection with the company as manager and treasurer, owing to ill health, as he stated, and left Alpena, defendant Collins being then elected general manager and defendant Corbin treasurer of the company. Soon thereafter the directors had an audit made of the books and accounts of the company by expert accountants from Detroit. Plaintiff became a director in the company in the spring of 1912, after Collins had become manager and Corbin treasurer. Roberson having dropped out, he accepted the trusteeship of the Netherlands property held as security for the indorsers and makers of the $23,000 of notes given the fall before, which were renewed. In July, 1912, the $15,000 note was given for the indebtedness subsequently represented by the notes here involved, and on April 28, 1913, to save the Neth-

erlands which they had been unable to sell, a further agreement was executed between all these parties and one Culligan which provided that plaintiff, under the trust agreement of May 11, 1912, might as trustee borrow $12,000 from Culligan and $12,000 from himself, the same to be applied to paying off the "third trust against the Netherlands property in Washington, D. C., together with interest charges and taxes and expenses accrued against said property," with a concluding provision that in case the trustee made a sale of the property the proceeds should be applied as stated in *Comstock* v. *Potter, supra,* 633.

Defendants' chief ground for denying liability on these notes arises from their claim that when the first set of notes, aggregating $23,000, was given in September, 1911, and later when the trust agreement of May, 1912, was entered into, plaintiff represented to them that the Netherlands property was worth $200,-000 and they were thereby induced to sign the notes under the belief that the equity in the same held by him as trustee was ample protection. As to the claimed representation in connection with the first notes we fully agree with the following view expressed in the opinion of the trial court:

"Plaintiff denies making any representations whatever at the September meeting. In my view of the case, it is unnecessary to decide whether or not he did so. It must have been understood by all concerned that plaintiff had no greater knowledge of the value of the Netherlands property than any of the defendants, except Mr. Roberson, who is not contesting this matter. Roberson alone had seen the property and whatever information plaintiff or any of the defendants, except Roberson, may have had as to its value, was based on Roberson's report, of which defendants had as full knowledge as had plaintiff."

Plaintiff had not at that time seen or made investigation as to the value of the Washington property, had

been absent from Alpena much of the time since the auto company was organized, had no stock in it except the few bonus shares received with his subscription for a Chamber of Commerce lot, along with other citizens, and had declined to further become interested in the company, or participate in its management. The testimony is persuasive that his knowledge of its financial affairs and the value of its assets came from and was presented to him by defendants in such manner that he rather than they was, if not misled, at least overpersuaded to become actively interested. Beyond his own positive statements there is much in the record lending support to the following testimony of Roberson as to how plaintiff first became an indorser for and associate with defendants in the affairs and management of the company:

"We appointed a committee to confer with Mr. Comstock and see if we could not possibly interest him to help us out by indorsement. Up to this time Mr. Comstock had persistently declined to have anything to do with the company. * * * I may state further that he had 15 shares of common stock and 15 shares of preferred stock when the company was organized, but this stock was merely the bonus that accompanied the purchase by him, along with dozens of other Alpena citizens, of three of the Chamber of Commerce lots. Mr. Corbin frequently told me that if it was possible to get Will Comstock into this Motor Car Company * * * he could be of the very greatest service to us with his name merely attached to the personnel of the organization. Furthermore that if we once got him behind us that he would have to help to see us through. Consequently about this time when we held a meeting Comstock's name was always suggested by somebody, and various plans were discussed as to how we could get Comstock into it. This committee, above referred to, went to Comstock and by appealing to his civic pride, his enthusiasm for the Chamber of Commerce, his large interests in Alpena, and so on, finally got him to go into it. Comstock agreed that if Culligan would advance the $3,000, and

if J. D. Potter and J. J. Potter would indorse for $3,000, in addition, that he would indorse for his *pro rata* share of the balance." *　*　*

Previous to the meeting of May 11, 1912, when the $15,000 note was given, plaintiff had, at request of the directors, visited the Netherlands property when in Washington and made some investigation as to its value. Defendants charge and testify that on his return he misrepresented its value, claiming it was worth sufficient beyond the incumbrances to protect all the paper they signed or indorsed to raise money for the auto company, and failed to inform them of estimates or appraisals he obtained from certain real estate men in Washington. He positively denied this, and claimed that he not only made no misrepresentations to defendants as to its value but that he truthfully reported to them what he saw and learned touching the character of the property and its probable value.

To review the conflicting testimony on this issue of fact would serve no helpful purpose, but from this record, considered in its entirety, we find no occasion to disagree with the following conclusions and reasons of the learned trial judge who heard the case and saw the witnesses who testified before him:

"The burden of proof, of course, is upon the defendants. Taking into account the testimony of disinterested witnesses as well as of those that were interested and the probabilities and circumstances that naturally surround such a situation, I am clearly of the opinion that the defendants have failed to make out their case. No motive can be imputed to the plaintiff sufficient to have induced him to deceive any of the defendants or himself and he would naturally become the greatest victim of his own deceit. *　*　* Sufficient motive has been shown to have induced all of the parties to sign these notes irrespective as to the representations of the value of the Netherlands property. They were all much interested in the Motor Car Company, which was to acquire the proceeds of

these notes. . Witnesses Levyn, Krebs and Nunnelley were disinterested and testified that the plaintiff did not make the representations claimed by certain of the defendants. Defendants claim that these witnesses were not present at the meeting in question; but the records of the Motor Car Company signed by one of the defendants and presumably written at a time when this controversy was undreamed of, show that they were present."

Beyond the showing, which is not disputed, that plaintiff as trustee of the Netherlands property has made honest effort without avail to sell 'it at a fair price which would realize something beyond the incumbrances upon it and was continuing to do so, his stewardship as trustee of that property is not involved or passed upon in this decision. The controlling question determined here is fraudulent inducement to sign these notes, and whether contribution by defendants is contingent upon a sale of the trust property, which defendants alleged was of no value beyond the incumbrances thereon, and the verification of a deficiency. If, as suggested in the brief of defendants' counsel, changed conditions in Washington owing to the present great war have resulted in enhanced values of property like the Netherlands, it may prove fortunate that forced sale of the property has not been made, for plaintiff is yet bound to faithful performance of the conditions of his trust agreement by which he holds this property in the interest of defendants, and all for whom he is trustee, and is holden to strict accounting to them for the same, in relation to which this decision is without prejudice.

The decree is affirmed, with costs to plaintiff.

Ostrander, C. J., and Bird, Moore, Brooke, Fellows, Stone, and Kuhn, JJ., concurred.